Good morning. May it please the Court, I'm Cindy Martin, appearing on behalf of Appellants 4-K Marine LLC and Central Boat Rentals, Inc. 4-K Marine is the owner and Central Boat Rentals is the operator of the vessel Miss Elizabeth. For convenience, I will refer to the appellants collectively as Central Boat or Central Boat Rentals. Central Boat Rentals appeals the decision of the District Court to not require Appalachee Enterprise Marine Services to fully reimburse Central Boat for the cost of paying for the back surgery of Prince McKinley, a Jones X seaman employed by Central Boat. The pertinent underlying facts are relatively straightforward and undisputed. Before June 4, 2015, Central Boat employed Prince McKinley as a relief captain as well as Justin Price as a deckhand aboard the vessel Miss Elizabeth. Up to that date, both men were considered good employees and never complained of or demonstrated any physical impairments. In fact, Central Boat's personnel manager testified that McKinley was regarded as a good and capable employee. However, on June 4, 2015, the vessel Tommy, owned and operated by the Appalachee Enterprise Marine, alighted with Miss Elizabeth when the Miss Elizabeth was stationary against the bank of the Mississippi River waiting on entrance to the Algiers Locks. It is undisputed that the elision was entirely the fault of the Tommy and that the Miss Elizabeth was blameless. This was the ruling of the District Court below. Immediately after the elision, both McKinley and Price claimed personal injuries. Specifically, both claimed back injuries and then McKinley later claimed a knee injury. After the elision, McKinley sought treatment with Dr. Marco Rodrigo for neck and back pain, and he continuously received treatment for his neck and back pain throughout this litigation. Central Boat Rentals filed a limitation liability proceeding on December 3, 2015, in which both McKinley and Price made claims for their personal injuries and for maintenance and cure. Shortly thereafter, Central Boat Rentals provided its initial disclosures pursuant to Rule 26, and included in the disclosures were medical records of Justin Price which showed that he had some preexisting back issues. During a meeting between counsel for Central Boat, counsel for Enterprise, and a claims adjuster for Central Boat, Enterprise Marine agreed to reimburse Central Boat for maintenance and cure paid by or on behalf of McKinley and Price. At the time of this conference, Enterprise Marine either had or should have had knowledge of McKinley's prior history and because of the initial disclosures, they did have knowledge of Price's medical history. Thereafter, up until late October, early November 2016, Enterprise Marine did, in fact, reimburse Central Boat for maintenance and cure paid to or on behalf of both Prince McKinley and Justice Price, including at that point a back surgery for Mr. Price. Around that time, McKinley's treating orthopedist causally related McKinley's back condition to the elision and recommended that McKinley undergo back surgery. Counsel for Enterprise Marine then informed counsel for Central Boat that Enterprise Marine had obtained medical records showing that McKinley's back condition may have been preexisting and urged Central Boat to file a McCorpan defense. However, based on the information available to it at the time, Central Boat felt that the right thing to do was to ensure that its employee received proper medical treatment based on the recommendation of the treating physician. In addition to the simple fact that Central Boat cares about its people, Central Boat factored into its decision that prior to the elision, McKinley had been a good employee, capably performed all his job duties, never complained about back injury or back pain, and is treating a physician opined that his condition was causally related to the elision. Central Boat opted to go ahead and guarantee payment for McKinley's back surgery and negotiated a slightly reduced cost of $114,000. And this was the amount that we stipulated to a trial. There's a finding from the district court that it was not related to this, the surgery was not necessary for this incident. It was for preexisting conditions. Is that a factual finding that we have to review only for clear error? It's a factual finding, yes. We are not appealing that decision. What we're appealing is, you know, hindsight is 20-20, Your Honor. And we're saying at the time that we guaranteed payment for the surgery, the information that we had was that it was causally related to the elision. And as his Jones Act employer, we had the obligation to guarantee that surgery. That's our contention on appeal. So McKinley underwent the surgery on February 9, 2017. However, at that point, we still had hopes the Enterprise Marine would agree to or the district court would require them to reimburse us for the surgery. When neither occurred, Central Boat lost the opportunity for the discount and ultimately paid a total of $125,000 for the surgery. So the question presented by this appeal is, as between an innocent vessel owner employer paying maintenance and cure in good faith and the third-party tortfeasor of those two, who should bear the cost of the seaman's medical treatment triggered by the third party's fault, even though it's ultimately decided that the seaman's condition was preexisting? Well, you phrased the question that way, and you certainly have spoken as you should from your client's point of view. What does seem to me from the negligent party in the maritime incident, their interests are not irrelevant, and they are to some extent at your mercy when you are paying the medical costs that may not be related to the incident for which they are responsible. So their interests are not insignificant, and it does seem to me there was notice earlier than the actual surgery, was there not, that this back surgery may not have been necessitated by the incident? Yes, so in the late fall of 2016, there were some medical records, some other records that came up that showed that he may have had a preexisting condition. So the issue was in play before the back surgery. It was in play, Your Honor, but as I said, at the time, the majority of the information we had is that his back surgery, his back condition, was caused by this elision. Again, he had worked for us for two solid years, performed all his duties. It's a fairly physical job, being on a boat, never complained of back pain, never had any issues, and we had a very well-respected, you know, we're all in this business, we deal with doctors all the time, personal injuries, you know, very respected orthopedic surgeon who was causally relating it. So we got this sort of balance. We have this almost automatic obligation to pay for his medical treatment, and we also are facing some fairly stiff penalties for failure to do so. Well, you have a variety of arguments, contractual and stopful, but looking just at the law of maintenance and cure, what authority is there? You talk about policy almost and who in this world, with your obligations to provide it to your injured worker. I heard a little bit of string music as you were talking about how important this was. But just looking at the law that's relevant here in the maritime arena, what law would require the negligent party who caused the accident, who is responsible for the injuries that it causes, what in all of that would make Enterprise responsible for injuries it did not cause, other than sort of the policy-laden arguments that you gave us? Well, the courts have held, and it originally was the Adams decision, I believe Adams v. Texaco, where it didn't speak in terms of injury. It spoke in terms of what triggered the need for maintenance and cure. In this situation, what triggered that claim for maintenance and cure was the elision caused by Enterprise Marine. And if you look at it in a certain way, we're going along fine. Everything's going great. We have a relief captain that we really like. He's doing his job. It's great. He seems happy. He seems healthy. And then boom, we have an elision, and suddenly we've got a maintenance and cure claim. So who has to bear the responsibility for that? The completely innocent vessel owner. We're just dumb and happy, minding our own business. And then our vessel is hit, and now we've got a maintenance and cure claim we've got to deal with. So, again, it comes down to the decision. It's between these two parties, the innocent vessel owner and the third-party tortfeasor, who has to bear the risk, basically. Would you agree that's really an equitable argument, which may be sufficient, but isn't that just an argument of equity and not of anything that could derive directly from the law that's before us on maintenance and cure? No, I wouldn't necessarily say so. For example, in situations where the employee is also at fault, and so the third-party tortfeasor only has a certain portion of the blank, but they end up having to reimburse 100%. In the Bertrand v. Freeport Macaron case, the party that was appealing that case, HOMA Industries, was only 20% at fault, but had to end up reimbursing 50% of the liability that's shared with another tortfeasor. And HOMA's argument was, well, that's not fair. And the court said, well, we realize it's not fair to you, but what we're concerned about is what's fair to the innocent vessel owner, you know, in essence, I'm paraphrasing. So I think that what the case law has shown is that even when the third-party tortfeasor is not 100% at fault, they still end up with the majority of having to reimburse. Would there be any limit? Would it have to be a reasonable expense? Because the problem is, if it's true that since they committed the tort, they're responsible for everything, I mean, what would stop you from saying, oh, go to the best doctor, and, oh, maybe you need surgery on this. Why not just get the best, you know, all the surgery at the top prices? I mean, would it have to be a reasonable expense? How would you limit that concern that you would have no, there would be no reason for you to be vigilant if it's all going to be passed on to someone else? Well, in this particular case, Your Honor, what sort of dovetails with, you know, we're talking about the reasons why we made the decision when we made them. And one of the reasons we had is that we had an agreement in place with Enterprise to, they were voluntarily reimbursing us. And as part of that agreement, there was a procedure in place for auditing of the medical bills. And once they were audited, they were then sent to Enterprise Marine. So. I guess I'm talking more, if the rule you want us to say is, yes, they're always responsible for, the tort fees are always responsible to indemnify for maintenance and cure, does there have to be some limit on that so that the employer's not just saying, sure, go do everything, because it's not coming out of my pocketbook. I'll, you know, ultimately, I'll pay for whatever up front because I'm going to get reimbursed. I mean, that's the concern I think Judge Southwick might have alluded to as well. Yeah, I mean, I agree in general that it should be reasonable. I don't think there was ever any evidence that this particular cost was unreasonable. We had an orthopedic surgeon that recommended it. It was audited, medically audited by the claims adjuster. So, and I just think that that's an element in all damages cases, that it was a reasonable expense. So I don't think the rule that I'm asking you to make would contravene that. And also that it was reasonably related to this incident? I think that's where the maintenance cure law diverges from just sort of general tort law, because the unique relationship between the best loaner and the Jones ex-human and the, you know, automatic obligation that we have to pay maintenance and cure. Well, you had the McCorpin defense, and if you had been willing to raise it, I mean, you suggest punitive damages arise almost immediately. I think maybe your friend on the other side is a little bit better of that. It seems to me at least so long as you're acting reasonably in raising a defense that we're not responsible because that's not related to what we're dealing with here, whatever it is, surgery that you want, you had the right to raise it. And the concern that this case raises is that in not pursuing that because there's maybe because there's somebody else really ultimately holding the tab, you sort of change the whole dynamics of what that is supposed to protect, the McCorpin defense, and that you're shifting it to somebody else by your failure to raise it when the issue itself was before you. Well, while, you know, a vessel owner certainly has, you know, a right to investigate a claim and they have a right to raise a McCorpin defense, there's no obligation to do so. And I think that what we're concerned about with this case is that, you know, imposing that kind of obligation because paramount to amortize the protection of the seaman, and they have the right to receive prompt and contemporaneous, you know, payment and maintenance and cure. So if you, you know, if the rule comes down in this case, well, you know, Central Boats doesn't get reimbursed because they could have asserted a McCorpin and they didn't, well then what happens? Every vessel owner goes, oh, my God, I have to assert a McCorpin or I might lose my right to be reimbursed. And that would just have a very chilling effect on the rights of seamen. And so, you know, getting sort of . . . The parties just have to act reasonably. It's not in every case you raise a McCorpin defense. It's just if there's evidence in front of you, you pursue. If you want to get fully reimbursed for what you pay, then you have to be vigilant to your own rights. And otherwise, you're potentially, as what the district judge is holding, well, I'll have to decide if we agree with that. But it seems to me the parties just have to act reasonably is all that the district judge was indicating. And, you know, again, I'm not trying to be argumentative. I think based on the information . . . We are. You need to be argumentative. That's why you're here. Based on the information we had, the particular facts of this case at the time when we made that decision, you know, we felt that it was more prudent to go ahead and see that he got the surgery. And, again, you have to sort of add the personal element. You know, the Central Boats knew this fellow very well. And they turned out to be wrong. Sometimes we do and we judge people. But they really felt like he was telling the truth. So, yes, they took a risk by not asserting McCorpin. There were a variety of reasons for that. Okay, Counsel. You have time for rebuttal. Okay. Thank you. Good morning, Your Honor. Randolph Waits on behalf of Enterprise Marine Services. I think that the questions posed give me the impression that the court has a pretty good handle on what happened. This was a lengthy litigation that arose out of a simple bump. What caused this simple bump was an error on the part of my client. And the court found that. And he found other facts, facts that were important. And as trial judges, you all know, you have to make some hard factual credibility calls. A seasoned trial judge, Lamell, did that. This is a completely fact-bound credibility call made by him regarding this case. Judge Southwith, you pointed out something very important. Months before the trial, when they decided to guarantee the medical charge, they were aware that Mr. McKinley was a fraud. That Mr. McKinley, and that's what Judge Lamell ultimately found. You're a fraud, Mr. McKinley. You should have told your treating doctor that you'd had an accident in 2006, who had recommended the exact surgery that you're asking to be done in 2017. You're a fraud for not telling your doctor about that. And that's what the court found. They, knowing that he's a fraud, wanted to do what probably most Jones Act employers do these days, thanks to the Atlantic sounding case. They wanted to avoid the payment, potential payment, of punitive damages with insurance company money. That's what they did. And so they did that months in advance of the trial. We entered into a stipulation of a negotiated value, and then we went and tried the case. Hard fall by both sides, with 4K aligning with the plaintiffs, saying it's 100% all Enterprise's fault, and you need this back surgery, and you needed that back surgery, Mr. Price. The court, listening to it all, knew what had happened. Price got his surgery right away. He was a total fraud, and the court found him to be a total fraud. He had had back problems for years leading up to his employment. He concealed it from him. I'm a Corpin judge. He concealed it from his employer in the process, and we, Enterprise, paid those early on. But as Discovery, and you all know that Discovery takes time, as Discovery flows in in advance of trial, months before he agrees to pay the $114,000 for the surgery, we put him on notice. Listen, we maybe shouldn't have even paid for Price. He's a fraud. He had had a bunch of prior problems, and we're not going to pay for this future surgery that McKinley wants because he's a fraud too. And that's exactly what Judge LaMelle found. These two gentlemen making claims? Frauds. Back brick conditions for both of them? Not related to this minor bump that occurred. There were about seven people out there on this day when the minor bump occurred. Unfortunately for Forquet and the appellants in this case, he had two fraudulent, lying workers on his boat who seized upon this opportunity to work the system and try to get money out of it. That's what happened here. So this case is real simple. It's fact-bound. The judge made the decision based on the facts. There's no law that supports the appellant's position in this case. The agreement, it was brought up. The agreement was entered into during Discovery and before the information was developed regarding these liars, this fraud, and their attempt to work the system. We ended up informing the other side, we're not paying any more. You shouldn't pay either. These guys are frauds. And that's what Judge LaMelle concluded. And I think you both, the whole panel seems to have the theme of this case, which is this was a minor little event. The only thing that brings us here today is the guarantee that a 4K appellant entered into to avoid punitive damages. It's a minor bump. It's a fairly big legal issue in the scheme of things. Without saying exactly how this should come out, that's still to be developed. It does seem to me that the issue being raised by the appellant is quite serious, which is, and you've alluded to it several times, with this threat of punitive damages, if they don't fully support the maintenance and cure obligations that they have and end up improperly denying it, there's some very serious liability. So in that sort of world that exists, when it not yet settled, you talk about Discovery and how long it took for all of this to be developed. At the time they needed to be making their decisions was earlier in the process than the trial in front of Judge LaMelle. So once those decisions are made, and with your client ultimately holding the reimbursement obligation, where does the risk of all this properly fall? My concern is there's not a lot of guidance in the law on this as to where this ultimately should fall, although then there are some general rules of thumb, such as your client shouldn't be liable unless he was responsible. The flip side is they have an obligation to pay for all of this unless it's clearly not necessary, and that was a little hard to say at the time they were making the payments. Do you have any law for us, other than what you were talking about, about how exactly what gives some clarity to how this ought to work out? I think the McCorpin law gives some clarity to it in the defense that should have been raised by 4K when we brought this to their knowledge months in advance of the trial. McCorpin says that an employer, Jones Act employer, who determines that the employee has withheld material medical information can act reasonably and not pay for that material information withheld if the condition is the same condition as found in Judge Vance and in the Johnson v. Senat case. So I think if you look at the McCorpin law, it gives you a reasonable component that the employer raises the McCorpin defense and he requires the Jones Act seaman to reasonably show causal relationship of the condition and that the medical charges, as the Court raised, are reasonable. You can't hire the most expensive doctor in the world to do it and call it reasonable. You can't have a condition that's totally unrelated to the event and make it reasonable. So I think it's just an expansion of McCorpin law would give the Court what's needed in this situation. What is critical for the decision made by Judge LaMelle is he made an equitable decision. We had paid for all of Price, his surgery, his maintenance, all the way to maximum cure, because it was all prior to our discovering that Price was a fraud, a liar, and a cheater that had a bad preexisting condition that was identical to the one repaired. And what the equitable decision by Judge LaMelle was, am I going to, do I give the money back to him? I don't think that's fair. Do I give the money back to Enterprise? No. But do I give Forte, who goes into this with full knowledge that Mr. McKinley is a liar, cheater, and a fraud and decides to guarantee a medical charge, do I give them the money? No. These are two sophisticated businesses that deal with these issues all the time. They know they should act reasonably. It was reasonable that I don't give back the money to Enterprise that was paid in the Price case, and it's reasonable that I don't give the Forte appellant interest this $114,000 because they went into this eyes wide open. They knew exactly what was coming. They knew if Mr. McKinley prevails, they did the safe thing. They paid the $114,000, which was probably a negotiated lower value, and they avoided the punitives. They did the safe thing. But the judge at the district level knew that, and what he decided to do is something equitable, which the court, it's a law, maritime law, allows him to do. It was a fair and equitable decision to decide the case just as he did. What we're hearing today is Mr. McKinley didn't appeal. Mr. Price, who got zeroed, didn't appeal. Enterprise, who had to pay for Mr. Price's maintenance secure that we really wouldn't have owed had we known all about it, we didn't appeal. And the only person that appealed is Forte as appellant because they made a bad decision with the knowledge they had to pay the $114,000. And if the court, I have additional time. I think I've covered the topics I need to cover unless one of your honors has a specific question. Thank you, Counsel. Let me find my glasses. There they are. Still in one piece, I hope. Hello. Just briefly, to address a couple of points, Mr. Waits repeatedly emphasized that Central Boats knew, you know, beyond cavale, that McKinley was a fraud before he decided to guarantee the surgery. And I've touched on this a little bit before. We did not know any such thing at the time. Again, we had a recommendation from his treating physician, whose opinion is entitled to great weight, that this was a causally related injury. And, of course, we had his work history, where we knew who could capably perform his job before the elision, and he had no back injuries. And Enterprise's Marine decision to not agree to reimburse it was based primarily on an independent medical examination of Dr. Sinak. And as we all know, you know, we had in one hand a treating physician's recommendation, and in the other hand an IME recommendation. And the treating physician's recommendation is usually given greater weight. And, you know, another point is that even knowing that at this point Justin Price's condition was preexisting and possibly McKinney's was, Enterprise paid all maintenance and cure, even maintenance on Justin Price up until the time of trial. So when we were making this decision to whether or not to guarantee the surgery, we had every reason to believe that we would possibly still get reimbursed. So it wasn't an unreasonable decision. It wasn't something that we did in a vacuum of information. And based on all the information we had at the time, it was a very reasonable decision to make factually. And then when you include the jurisprudence, which says we had this automatic obligation to do it, including guaranteeing the surgery, you know, as opposed to being faced with penalties, it was a very prudent decision to make. You know, and concerning Justin Price, it's not in the record because initial disclosures aren't, but we sent initial disclosures on February 6, 2016. This was three months before Enterprise Marine agreed to reimburse us. And in those initial disclosures, we included a CD that had records from Shaw Bear Medical Center, which detailed Mr. Price's prior back history. So again, they had knowledge that this one fellow had, you know, preexisting issues. They reimbursed us for that back surgery. So when it came time for us to make the decision about McKinley, again, we were very reasonable in thinking that we would get reimbursed for that. And I'm very concerned about this assertion about the requirement that Central Boats had to assert a McCorping defense. That is something that you should use very sparingly in very particular circumstances. And given that the protection of the rights of the seaman is of paramount importance to Admiralty, requiring a Jones Act employer to have conducted an investigation into the seaman's claims and or requiring the employer to have asserted a McCorping defense and or requiring the employer to wait to get into the court world on its right to reimbursement before paying maintenance and cure would have a very chilling effect on the rights of the seaman. Well, so it seems to me that's not what the rule would be. The rule would be that you are at risk of not being reimbursed, but not that you're required, but ultimately some fact-finding as occurred here might eliminate your right to reimbursement. Doesn't that at least reduce the kinds of risks that you're talking about? You don't have to assert the McCorping defense, but absent that and absent resolution of all that before you pay for maintenance and cure, it may yet ultimately prove that you don't get reimbursed. That's all substantial, but that's the only effect of this without risking the punitive damages that you're talking about. In the facts of this case, because it was so late in the game, yes, you could have said okay at that point. I think the risk is that in the beginning when somebody asserts a maintenance and cure claim, if you're saying to the employer, okay, well, you're going to risk not getting reimbursed by the tort fees, or if you don't assert that in the beginning, you don't investigate it, you don't assert your McCorping defense, well, then all vessel owners would say, okay, well, we're not going to pay anything until we go through this process. And I just think that's a danger in following the enterprise's main argument, which is their argument as well. They're not entitled to be reimbursed because they didn't assert a McCorping defense, and that's what I see as a danger in that argument. So unless there are any more questions, I thank you very much for your time, Your Honors. All right. Thank you both for bringing this to us. That concludes our arguments. So morning includes our arguments of the week.